UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARQUIS RASHAWN DOUGLAS,

        Plaintiff,

       v.

VIMAL SINGH, *Warden, California Medical Facility*,

        Defendant.
_____/

No. C-11-5370 EMC

**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS**

        This is a habeas case filed by a state prisoner, Marquis Rashawn Douglas, pursuant to 28 U.S.C. § 2254. Mr. Douglas was convicted by a jury in Napa County Superior Court of second degree murder (Cal. Pen. Code § 187), *see* CT 544 (count one); shooting into an inhabited house (Cal. Pen. Code § 246), *see* CT 549 (count three); discharge of a firearm in a grossly negligent manner resulting in death (Cal. Pen. Code § 246.3), *see* CT 550 (count four); possession of a firearm by a minor (Cal. Pen. Code § 12101(a)(1)), *see* CT 552 (count five); and possession of live ammunition by a minor (Cal. Pen. Code § 12101(b)(1)). *See* CT 553 (count six). For the count of second-degree murder alone, Mr. Douglas was sentenced to a term of 15 years to life. *See* CT 728 (also listing the sentence for the remaining convictions).

        As grounds for habeas relief, Mr. Douglas asserts that his right to due process and a fair trial was violated when the trial court gave an improper jury instruction on the "natural and probable

consequences" doctrine. Having reviewed the parties' briefs and accompanying submissions, the Court hereby **GRANTS** Mr. Douglas's petition.[1]

## I. BACKGROUND

For purposes of his petition, Mr. Douglas has adopted the statement of facts contained within the state appellate court's opinion of April 15, 2010. *See* Pet. at 11 & Ex. A (order). The Court provides a brief summary of those facts.

The offenses at issue were committed the night of January 27, 2007. On that night, a "Sweet 16" birthday party was held for Chanel C. at her family's home in American Canyon. *See* Pet., Ex. A (Order at 2). Chanel's father made security arrangements for the party, which included having Chanel's brothers and cousins "screen the guests upon their arrival to verify that they were invited and to check for weapons or alcohol." Pet., Ex. A (Order at 3). Guests were generally restricted to the garage where the dancing took place. *See* Pet., Ex. A (Order at 3).

Mr. Douglas and his brother, Junor, went to Chanel's party. Although neither Mr. Douglas nor Junor was invited to the party, one of their friends, Alfonzo Reed, was invited and he in turn asked Mr. Douglas and Junor (as well as another friend, Davone Bracy) to the party. Mr. Douglas brought a .22-caliber revolver to the party with him. He loaded it with six to eight bullets "due to the 'strong possibility' that someone might start a conflict that would result in shooting." Pet., Ex. A (Order at 3). Chanel allowed all four into the party. The gun was left in Alfonzo's car. *See* Pet., Ex. A (Order at 3).

At some point during the party, Alfonzo got into an argument with a girl. The girl got on the phone to call someone, and Alfonzo believed that she was calling friends known as the "Bridge Boys." Alfonzo had a previous dispute with one of the Bridge Boys "so he became 'real pumped up' and 'ready to fight.'" Pet., Ex. A (Order at 3). "At Alfonzo's request, [Mr. Douglas] retrieved the loaded gun from the car and placed it in his pants, under his pea coat with the barrel pointed down." Pet., Ex. A (Order at 4).

---

[1] Because the Court is granting Mr. Douglas's petition for habeas relief, his request for oral argument is moot. *See* Docket No. 17 (motion).

2

Approximately thirty minutes later, six of the Bridge Boys arrived at the party. Alfonzo and Junor prepared to fight the Bridge Boys but Chanel, her brother, and her cousin tried to stop things. "Alfonzo complied with [the] directive to 'back off,' but Junor became uncooperative and enraged when [Chanel's cousin] held him firmly by the shirt and didn't let him go.'" Pet., Ex. A (Order at 4). Junor and the cousin then got into an altercation, with Junor threatening to kill and shoot the cousin as he was forced out of the garage and on to the driveway. "Tanika W., who arrived at the party to pick someone else up, testified at the preliminary hearing that when she asked [Mr. Douglas] if a fight was about to happen, he replied, 'nah, I think somebody is going to be popped [*i.e.*, shot].'" Pet., Ex. A (Order at 4).

Mr. Douglas was standing by some bushes near the driveway when Junor approached him and stated:

> "Hand me the piece. I'm about to pop him. I don't care. I'm about to do it right now." [Mr. Douglas] responded, "No that's not smart." Junor placed his hands around the waistline of [Mr. Douglas's] pea coat and attempted to "grab something" as [Mr. Douglas] was "trying to walk off." Junor repeatedly demanded that [Mr. Douglas] give him "the strap" as the "tussle" to extract the gun continued momentarily. One witness, Rodel [Chanel's brother], testified that [Mr. Douglas] assisted Junor in his effort to get the gun out of the coat, as they both "were yelling to get something out." Other witnesses thought [Mr. Douglas] attempted to prevent Junor from taking the gun. Junor made a "quick turn" of his body as though he jerked an object away from [Mr. Douglas]. After Junor took the gun, [Mr. Douglas] moved toward the street and a witness heard him warn Junor, "'That's hot,' meaning not smart."

Pet, Ex. A (Order at 4-5).

Three gunshots were then fired from Junor's location. "Alfonzo testified that the first and second shots were fired into the air, but the third shot was fired by Junor directly toward the house." Pet., Ex. A (Order at 5). In addition, Tanika "testified that she observed at least one shot fired by Junor with his hand in the air, and another shot fired as he pointed his hand at the garage." Pet., Ex. A (Order at 5). Junor and Mr. Douglas "were then seen running away with a third person." Pet., Ex. A (Order at 5). Anthony Gee was killed with a fatal gunshot wound to the head. *See* Pet., Ex. A (Order at 5).

During the trial, Junor – who was a co-defendant along with Mr. Douglas – testified that the shooting was an accident "in part due to a malfunction of the gun." Pet., Ex. A (Order at 5). He also testified that Mr. Douglas was responsible for first getting the gun out of the car but indicated that, during the events at issue, Mr. Douglas told him to "'be cool' and backed away [when] Junor reached for the gun." Pet., Ex. A (Order at 6).

Mr. Douglas also provided testimony during the trial. More specifically, he testified that "[h]e brought the gun to the party because he thought other people there might be harmed and 'look for trouble,'" that he was to one to get the gun after the dispute between Alfonzo and the girl, but that he kept the gun rather than giving it to Alfonzo because he did not want Alfonzo to have possession of the gun as Alfonzo had just threatened to shoot someone (*i.e.*, Chanel's cousin). Pet., Ex. A (Order at 6). Mr. Douglas further testified that, during the dispute between Alfonzo and the Bridge Boys, he left the garage because he "'was afraid of . . . one of the Bridge Boys trying to attack' him." Pet., Ex. A (Order at 6). When Junor approached him for the gun and reached for it, Mr. Douglas "also 'got a hold of it'" and said "'no'" to Junor as the two "'struggled over' the gun." Pet., Ex. A (Order at 6). According to Mr. Douglas, he "'tried to do all [he] could' to keep Junor from getting the gun," but Junor succeeded in grabbing it. Pet., Ex. A (Order at 6-7).

Based on the above events, Mr. Douglas was charged with unlawful possession of a firearm by a minor. Mr. Douglas was also charged with, *inter alia*, murder, shooting into an inhabited house, and discharge of a firearm in a grossly negligent manner resulting in death based on the theory that (1) Mr. Douglas had aided and abetted Junor in *Junor's* unlawful possession of a firearm (the target offense) and (2) the murder, shooting, and discharge as committed by Junor (the nontarget offenses) were the natural and probable consequences of Junor's unlawful possession of a firearm that Mr. Douglas aided and abetted.

After the evidence presentation was completed, the trial court instructed the jury on the law. Among the instructions given were the following three instructions, which were given in sequence:

**400. Aiding and Abetting: General Principles**

A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator,

4

who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.

Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime.

**401. Aiding and Abetting: Intended Crimes**

To prove that defendant Marquis Douglas is guilty of a crime based on aiding and abetting that crime, the People must prove that:

1. The perpetrator committed the crime;

2. The defendant knew that the perpetrator intended to commit the crime;

3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

AND

4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

Someone *aids and abets* a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him an aider and abettor.

A person who aids and abets a crime is not guilty of that crime if he withdraws before the crime is committed. To withdraw, a person must do two things:

1. He must notify everyone else he knows is involved in the commission of the crime that he is no longer participating. The notification must be made early enough to prevent the commission of the crime.

AND

5

> 2. He must do everything reasonably within his power to prevent the crime from being committed. He does not have to actually prevent the crime.

The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw. If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory.

**402. Natural and Probable Consequences Doctrine (Target and Non-Target Offenses Charged)**

Defendant Marquis Douglas is charged in Count Five of Possession of a Firearm by a Minor and in Count One with Murder; . . . Count Three Shooting at an Inhabited House; and Count Four Negligent Discharge of a Firearm.

You must first decide whether a defendant is guilty of Possession of a Firearm by a Minor. If you find the defendant is guilty of this crime, you must then decide whether he is guilty of murder, . . . shooting at an inhabited house and negligent discharge of a firearm.

Under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time.

To prove that defendant Marquis Douglas is guilty of Murder, . . . Shooting at an Inhabited House and Negligent Discharge of a Firearm, the People must prove that:

> 1. Defendant Marquis Douglas is guilty of possession of a firearm by a minor.
>
> 2. During the commission of possession of a firearm by a minor, a co-participant in that possession of a firearm by a minor committed the crimes of murder, . . . shooting at an inhabited house and negligent discharge of a firearm

AND

> 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of murder, . . . shooting at an inhabited house and negligent discharge of a firearm was a natural and probable consequence of the commission of the possession of a firearm by a minor.

A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the murder, . . . shooting at an inhabited house and/or negligent discharge of a firearm were committed for a reason independent of the common plan to commit the possession of a firearm by a minor, then the commission of murder, . . . shooting at an inhabited house, or negligent discharge of a

6

> firearm was not a natural and probable consequence of possession of a firearm by a minor.
>
> To decide whether the crimes of murder, . . . shooting at an inhabited house, negligent discharge of a firearm or possession of a firearm by a minor were committed, please refer to the separate instructions that I will give you on that crime.
>
> The People allege that the defendant Marquis Douglas originally intended to aid and abet the commission of either possession of a firearm by a minor or brandishing a firearm. The defendant is guilty of murder, . . . shooting at an inhabited house and/or negligent discharge of a firearm if the People have proved that the defendant aided and abetted either possession of a firearm by a minor or brandishing a firearm and that murder, . . . shooting at an inhabited house and negligent discharge of a firearm were the natural and probable consequence of either possession of a firearm by a minor or brandishing a firearm. However, you do not need to agree on which of these two crimes the defendant aided and abetted.
>
> To *brandish a firearm* means to draw or exhibit the firearm in a rude, angry, or threatening manner.
>
> In light of the natural and probable consequence doctrine set forth above, you may convict an aider and abettor of a lesser offense than the co-participant who actually committed the crime (perpetrator). This is so because you may not convict the aider and abettor of any crime which was not a natural and probable consequence of the commission of the crime of Possession by a Minor or Brandishing a Firearm as previously stated above. . . .

CT 484-89 (emphasis in original).

As indicated above, the jury ultimately convicted Mr. Douglas of, *inter alia*, possession of live ammunition by a minor, second degree murder, shooting into an inhabited house, and discharge of a firearm in a grossly negligent manner resulting in death. Mr. Douglas's conviction was affirmed by a state appellate court on April 15, 2010. *See* Pet., Ex. A (order). Mr. Douglas's petition for review in the California Supreme Court was subsequently denied.

## II. DISCUSSION

### A. Standard of Review

Mr. Douglas's habeas petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"); therefore, the provisions of that act are applicable. *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997). Under AEDPA, a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in

1  state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was
2  contrary to, or involved an unreasonable application of, clearly established Federal law, as
3  determined by the Supreme Court of the United States; or (2) resulted in a decision that was based
4  on an unreasonable determination of the facts in light of the evidence presented in the State court
5  proceeding." 28 U.S.C. § 2254(d).

   In the instant case, Mr. Douglas appears to be making a claim pursuant to § 2254(d)(1) only.

   In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *See LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). A state court decision is "contrary" to Supreme Court authority if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision is an "unreasonable application of" Supreme Court authority if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A district court "may not issue [a] writ [of habeas corpus] simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (noting that a decision challenged as an unreasonable application of Supreme Court law must not merely be erroneous, but "objectively unreasonable").

B.  Jury Instruction No. 402

   In the instant case, Mr. Douglas argues that his right to due process and a fair trial were violated because the trial court's instruction on the "natural and probable consequences" doctrine – *i.e.*, Jury Instruction No. 402 – was improper. Mr. Douglas focuses in particular on that part of the instruction which provides as follows[2]:

---

[2] Mr. Douglas refers to this portion of the instruction as the "numbered paragraphs."

> To prove that defendant Marquis Douglas is guilty of Murder, . . . Shooting at an Inhabited House and Negligent Discharge of a Firearm, the People must prove that:
>
> 1. Defendant Marquis Douglas is guilty of possession of a firearm by a minor.
>
> 2. During the commission of possession of a firearm by a minor, a co-participant in that possession of a firearm by a minor committed the crimes of murder, . . . shooting at an inhabited house and negligent discharge of a firearm
>
> AND
>
> 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of murder, . . . shooting at an inhabited house and negligent discharge of a firearm was a natural and probable consequence of the commission of the possession of a firearm by a minor.

CT at 487-88.

According to Mr. Douglas, the instruction above was defective because the first element fails to specify that Mr. Douglas is guilty of possession of a firearm by a minor based on an aiding-and-abetting theory – *i.e.*, that Mr. Douglas aided and abetted *Junor's* possession of a firearm by a minor. Mr. Douglas emphasizes that this should have been made explicit to the jury because the prosecution had also charged him with the same crime of possession of a firearm by a minor based on his *own* (and not Junor's) possession:

> In this case, petitioner and Junor were jointly charged in count 5 with possession of the same firearm. As was readily admitted by the defense at trial, petitioner was independently guilty of that charge based on his own conduct *prior* to Junor taking possession of the gun and firing the shots that were the basis for the nontarget crimes. The instruction informed the jury that the prosecution first had to prove that petitioner was guilty of possession of a firearm by a minor (omitting the requirement that it prove that petitioner aided and abetted Junor in his commission of this offense). Under the facts of this case, this requirement could be easily satisfied *without* a finding that petitioner had aided and abetted Junor in *his* possession of the gun. . . . Since the defendant's intend to aid and abet the commission of the target crime is an essential element of proving criminal liability under the natural and probable consequence doctrine, the instruction's omission of this element rendered the instruction unconstitutional.

Pet. at 17-18 (emphasis in original).

1    Mr. Douglas goes on to contend that, even if Jury Instruction No. 402 was not a clear
2 misstatement of the law but rather only ambiguous, "i.e., capable of being understood in a way that
3 is violative of constitutional principles," Pet. at 18, there was a reasonable likelihood that the jury
4 applied the instruction in a way that relieved the prosecution from its burden of proving every
5 element of the crime beyond a reasonable doubt. *See* Pet. at 18; *see also Waddington v. Sarausad*,
6 555 U.S. 179, 190-91 (2009) (noting that an ambiguity in an instruction "does not necessarily
7 constitute a due process violation[;] [r]ather, the defendant must show both that the instruction was
8 ambiguous and that there was a reasonable likelihood that the jury applied the instruction in such a
9 way that relieved the State of its burden of proving every element of the crime beyond a reasonable
10 doubt"). According to Mr. Douglas, there was a reasonable likelihood because (1) the deficiency
11 was in a critical part of the instruction (the "numbered paragraphs") so that any language used in the
12 remaining part of the instruction could not cure the deficiency, Pet. at 19, Trav. at 5; (2) the
13 prosecutor's closing argument conveyed to the jury that the first element above could be satisfied
14 based on Mr. Douglas's own possession of a firearm by a minor (and not his aiding and abetting of
15 Junor's possession); and (3) the defense counsel's closing argument also conveyed the same to the
16 jury.

17    During the state court proceedings, Mr. Douglas presented this same basic argument but it
18 was rejected by a California court of appeal. The state court noted first that "the meaning and
19 adequacy of instructions is determined under the test of whether there is a 'reasonable likelihood'
20 that the jury misconstrued or misapplied the law in light of the instructions given, the entire record
21 of trial, and the arguments of counsel." Pet., Ex. A (Order at 21) (internal quotation marks omitted).
22 It then noted that not only did the trial court give Jury Instruction No. 402 but also Jury Instructions
23 Nos. 400 and 401, which made clear that Mr. Douglas could only be found guilty of murder on an
24 aiding and abetting theory. The state court also found that Mr. Douglas's argument gave short shrift
25 to subsequent language in Jury Instruction No. 402 which advised the jury that

> the prosecution alleged [Mr. Douglas] "intended to aid and abet the commission of either possession of a firearm by a minor or brandishing a firearm," and he could be found guilty of murder or any of the other charged crimes if he "aided and abetted either the possession of a firearm by a minor or brandishing a firearm," and the

10

> charged offenses "were the natural and probable consequence of either possession of a firearm by a minor or brandishing a firearm."

Pet., Ex. A (Order at 24). The state court emphasized:

> Although the elements of aiding and abetting were given to the jury separately from the definition of the natural and probable consequences doctrine, we assume the jurors properly correlated the instructions to understand that the People had the burden to prove both the status of [Mr. Douglas] as an aider and abettor and the commission by Junor of the murder as the natural and probable consequence of the firearm possession or brandishing offense. . . . The jury was not left with the option of convicting [Mr. Douglas] for any of the nontarget offenses without finding that he also acted as an aider and abettor of the target offense of possession of the gun by Junor.

Pet, Ex. A (Order at 24).

The state court thus found that the jury instructions given were not deficient. Although, in evaluating the adequacy of the jury instructions, the state court did not discuss any comments made by the prosecution during its closing, the state court did so in addressing a separate, but related, issue raised by Mr. Douglas as part of his appeal – *i.e.*, his contention that the prosecution engaged in misconduct (which his trial counsel failed to object to) by arguing to the jury that "he could be found guilty of the nontarget offenses based on his own '*personal* possession of the gun, regardless of whether he aided and abetted Junor's possession of the gun.'" Pet., Ex. A (Order at 25) (emphasis in original). As to this assertion, the state court stated, *inter alia*, that it did not "discern any objectionable misstatement of the law" by the prosecution. Pet., Ex. A (Order at 25). The court added that,

> even if the prosecutor's remarks did amount to a misstatement of the law, "'they cannot be characterized as misconduct. "[A] prosecutor is not guilty of misconduct because in his argument of law to the jury, he is wrong as to the law . . ."' "Moreover, the court correctly admonished the jury that opening statements and closing arguments were not evidence, and '[w]e presume that the jury heeded the admonition and any error was cured.'"

Pet., Ex. A (Order at 25-26).

The Court finds that the state court's analysis above was objectively unreasonable. As a preliminary matter, the Court notes that it is not entirely clear whether the state court found the jury instructions ambiguous. To the extent the state court found the jury instructions *un*ambiguous, that

11

conclusion was not objectively reasonable. The instructions were ambiguous. It is true that Jury Instruction No. 402 stated in part that

> [t]he People allege that the defendant Marquis Douglas originally intended to aid and abet the commission of either possession of a firearm by a minor or brandishing a firearm. The defendant is guilty of murder, . . . shooting at an inhabited house and/or negligent discharge of a firearm if the People have proved that *the defendant aided and abetted either possession of a firearm by a minor or brandishing a firearm* and that murder, . . . shooting at an inhabited house and negligent discharge of a firearm were the natural and probable consequence of either possession of a firearm by a minor or brandishing a firearm. However, you do not need to agree on which of these two crimes the defendant aided and abetted.

CT 488 (emphasis added). However, as Mr. Douglas points out, this portion was not part of the "numbered paragraphs" in Jury Instruction No. 402. Moreover, it was separated from the "numbered paragraphs" by several paragraphs. Furthermore, it is not clear that the portion above was related to the first numbered paragraph, which simply stated that the first required element to find Mr. Douglas guilty of murder, shooting at an uninhabited house, and negligent discharge of a firearm was "[Mr.] Douglas is guilty of possession of a firearm by a minor." The first numbered paragraph fails to specify that Mr. Douglas is guilty of possession of a firearm by a minor because he aided and abetted *Junor's* possession of a firearm by a minor. *Cf. Mejia v. Garcia*, 534 F.3d 1036, 1045 (9th Cir. 2008) (stating that, because "reasonable minds can differ in their reading of whether the instruction allows for conviction on the non-sexual offenses based on a burden of proof other than beyond a reasonable doubt," that only "underscores the instruction's ambiguity").

Furthermore, the overall organization of the instructions was confusing. The aiding-and-abetting instructions were given before any of the instructions on the underlying crimes charged, including but not limited to possession of a firearm by a minor. Indeed, there were a number of instructions in between the aiding-and-abetting instructions and the instruction on possession of a firearm by a minor. *See* CT 484-89 (aiding-and-abetting instructions); CT 515 (instruction on possession of a firearm by a minor). This organization made little sense given the facts in the case and contributed to the ambiguity of the subject instructions.

1    The instructions were ambiguous. The state court's *assumption* that the jurors "properly
2 correlated the instructions," Pet. Ex. A (Order at 24), does not negate the ambiguity of the
3 instructions.

4    To the extent the state court found the jury instructions ambiguous but nevertheless
5 concluded that there was no "'reasonable likelihood'" that the jury applied the instructions in a way
6 that violates the Constitution, the Court finds that conclusion objectively unreasonable as well. *Id.*
7 at 193. First, the state court's conclusion of no reasonable likelihood was grounded in large part on
8 its finding that there was no discernible misstatement of the law by the prosecution. But it is clear
9 from the record that the prosecution make a critical – and glaring – misstatement of the law. In his
10 closing argument, while going through the aiding-and-abetting instructions applicable to Mr.
11 Douglas, the prosecutor stated as follows:

> Natural and probable [*i.e.*, Jury Instruction No. 402, in which the first numbered paragraph reads, "Defendant Marquis Douglas is guilty of possession of a firearm by a minor"]. First of all Marquis is guilty of possession of a firearm by a minor. *That's easy. All the evidence is overwhelming. He admitted it.* . . . But long before he admitted it the evidence was overwhelming that he committed that offense, so he's guilty of that offense.

16 RT 5499 (emphasis added). What is significant here is that Mr. Douglas admitted to his *own*
17 possession of a firearm by a minor; he never admitted to aiding and abetting *Junor's* possession.
18 Thus, the prosecutor effectively treated element (1) of Jury Instruction No. 402 as guilt based on
19 direct possession rather than aiding and abetting Junor's possession, and employed Mr. Douglas's
20 admission as to the former in that regard.

21    Second, to the extent the state court made an alternative finding that any misstatement of the
22 law by the prosecution was essentially inconsequential because the trial court admonished the jury
23 that opening statements and closing arguments are not evidence, that conclusion was also
24 objectively unreasonable for several reasons. For example, even if the jury was instructed that
25 closing arguments are not evidence, that misses the point; the prosecution here made a misstatement
26 of *law* (*i.e.*, guilt for murder, shooting at an inhabited dwelling, and negligence discharge of a
27 firearm could be predicated on Mr. Douglas's own possession of a gun, rather than Mr. Douglas's
28 aiding and abetting of Junor's possession). Furthermore, although the trial court also instructed the

13

jury that, "[i]f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions," CT 447, that did nothing to cure the patently ambiguous instructions; because of the ambiguity, a clear conflict was not apparent to the jury. Finally, it is important to note that the prosecution's improper statements here were not stray comments or comments that were not central to its argument in favor of guilt. The situation here is thus distinguishable from that in *Sarausad*, where the prosecutor gave only a hypothetical that could be problematic depending on how it was interpreted and where that hypothetical had nothing to do with the prosecutor's central argument in favor of guilt.[3] *See generally Sarausad*, 555 U.S. at 188-89 & n.3, 195 (stating that "[t]he state court's conclusion that the one hypothetical did not taint the proper instruction of state law was reasonable under this Court's precedent, which acknowledges that 'arguments of counsel generally carry less weight with a jury than do instructions from the court'"). Here, the prosecutor's argument and misstatement of the law were clear and central to the case.

   Not only did the state court fail to address the clear misstatement of the law by the prosecution, but it also failed to take into account defense counsel repeated the same exact error. During closing argument, defense counsel initially did make reference to the prosecution's "alleg[ation] that [Mr. Douglas] had an initial intent to abet, to possess, to aid and abet the possession of the gun by another person." RT 5568. Defense counsel also argued: "And I just have to say this one more time, instead of aiding and abetting or encouraging someone else to possess the gun each time, . . . [Mr. Douglas] did just the opposite." RT 5568. However, in wrapping up his discussion of aiding and abetting – and the natural consequences doctrine in particular – defense counsel stated as follows:

> Now under this natural consequences doctrine you have to consider all of the circumstances. And all the circumstances have to be such that you can say and be satisfied beyond a reasonable doubt that a normal person would know that if having the gun in your possession, *Marquis having the gun in his possession* [*i.e.*, not Junor] would lead to the commission of one of the first four counts, murder, attempted murder,

---

[3] Moreover, in *Sarausad*, the Supreme Court indicated that it did not find the jury instruction at issue ambiguous in the first place. *See Sarausad*, 555 U.S. at 191 (stating that "[i]t is impossible to assign any meaning to [the] instruction different from the meaning given to it by the Washington courts" because of the instruction's "plain terms").

> shooting at an inhabited dwelling, or negligence discharge of a firearm with injury . . . .

RT 5569 (emphasis added). This statement suggested the first four counts *could* be based on Mr. Douglas's possession of the gun, not his aiding and abetting Junor's possession. Thus, defense counsel compounded the error made by the prosecutor.

The fact that the Court finds the state appellate court's conclusions objectively unreasonable is not the end of the inquiry. For purposes of habeas review, the Court must also evaluate whether the trial court's instructional "error had a 'substantial and injurious effect or influence in determining the jury's verdict.' If [a court is] in grave doubt as to whether the error had an effect, the petitioner is entitled to the writ." *Coleman v. Calderon*, 210 F.3d 1047, 1051 (9th Cir. 2000).

The Court finds that this standard has been met, particularly because, while there was clear evidence that Mr. Douglas (a minor) had possessed a firearm, there was equivocal and disputed evidence as to whether Mr. Douglas had assisted in Junor's (also a minor) possession of the gun. *Compare, e.g.*, *Sarausad*, 555 U.S. at 193-94 (in alleged instructional error case, taking note of "the strength of the evidence supporting the conviction"); *see also Pisa v. Blanks*, 197 Fed. Appx. 586, 588 (9th Cir. 2006) (noting that, "[b]ecause 'the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction [was] properly found to be harmless'"). Notably, this was reflected in the state appellate court's recitation of the facts as follows:

> Junor skipped quickly backwards toward the bushes near the driveway to where [Mr. Douglas] was standing, as many of the other party guests left the garage. Junor stated to [Mr. Douglas], "Hand me the piece. I'm about to pop him [*i.e.*, Chanel's cousin]. I don't care. I'm about to do it right now." [Mr. Douglas] responded, "No that's not smart." Junor placed his hands around the waistline of [Mr. Douglas's] pea coat and attempted to "grab something" as [Mr. Douglas] was "trying to walk off." Junor repeatedly demanded that [Mr. Douglas] give him "the strap" as the "tussle" to extract the gun continued momentarily. One witness, Rodel [Chanel's brother], testified that [Mr. Douglas] assisted Junor in his effort to get the gun out of the coat, as they both "were yelling to get something out." Other witnesses thought [Mr. Douglas] attempted to prevent Junor from taking the gun. Junor made a "quick turn" of his body as though he jerked an object away from [Mr. Douglas]. After Junor took the gun, [Mr. Douglas] moved toward the street and a witness heard him warn Junor, "'That's hot,' meaning not smart."

15

1  Pet, Ex. A (Order at 4-5).  Moreover, it is significant that Mr. Douglas:  (1) initially got the gun from
2  car not at Junor's request but rather at his friend Alfonzo's; (2) even then, Mr. Douglas did not give
3  the gun to Alfonzo; and (3) the reason for getting the gun was because of an anticipated fight
4  between Alfonzo and the Bridge Boys (and not an altercation between Junor and Chanel's cousin
5  who tried to break up a fight with the Bridge Boys).  These facts all are consistent with the evidence
6  that Mr. Douglas had resisted giving the gun to Junor and had no intent to aid and abet Junor.

7  Because the evidence of aiding and abetting Junor's possession of the firearm was equivocal
8  and disputed, the Court cannot "'say with fair assurance . . . that the judgment was not substantially
9  swayed by the [instructional] error." *Coleman*, 210 F.3d at 1051 (9th Cir. 2000).

### III.   CONCLUSION

Accordingly, the Court hereby grants Mr. Douglas's petition for habeas relief.

Mr. Douglas's convictions on counts one (second-degree murder), three (shooting into an inhabited house), and four (discharge of a firearm in a grossly negligent manner resulting in death) are **VACATED**.  Unless the State of California reinstates criminal proceedings within sixty days to try him for those counts, the state trial court should resentence him in accordance with this order vacating the convictions on counts one, three, and four.

IT IS SO ORDERED.

Dated: May 6, 2013

_____
EDWARD M. CHEN
United States District Judge